**Civil Action No. 1:21-CV-00082**

# EXHIBIT A

FILED
12/23/2020 8:24 PM
Beverly Crumley
District Clerk
Hays County, Texas

CAUSE NO. 20-2871 _____

| | | |
|---|---|---|
| JOHN ZAVALA,<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | HAYS COUNTY, TEXAS |
| TEXAS LEHIGH CEMENT COMPANY, LP,<br>LEHIGH HANSON, INC., and EAGLE<br>MATERIALS, INC.,<br>Defendants. | §<br>§<br>§<br>§ | ____ JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, John Zavala ("Zavala" or "Plaintiff"), files this Original Complaint against Defendants Texas Lehigh Cement Company, LP ("Texas Lehigh" or "Defendant") and its partners Lehigh Hanson, Inc., and Eagle Materials, Inc., alleging violations of the Americans with Disabilities Act, as amended ("ADAAA") and Chapter 21 of the Texas Labor Code ("TLC") and would show as follows:

**I.   PARTIES**

1. Plaintiff John Zavala is an individual currently residing in Buda, Texas.

2. Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

3. Plaintiff seeks monetary relief over $200,000 but not more than $1,000,000.

4. Defendant Texas Lehigh Cement Company, LP is a domestic limited partnership which is authorized to do business in Texas and is doing business in Texas. Process may be served by serving Defendant's registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

1

5. Defendant Lehigh Hanson, Inc., is a foreign for-profit corporation which is authorized to do business in Texas and is doing business in Texas. Process may be served by serving Defendant's registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

6. Defendant Eagle Materials, Inc., is a foreign for-profit corporation which is authorized to do business in Texas and is doing business in Texas. Process may be served by serving Defendant's registered agent, Prentice Hall Corporation System I+, 211 E. 7th Street, Suit 620, Austin, Texas 78701.

7. Defendant Lehigh Hanson, Inc., is the general partner of Texas Lehigh Cement Company, LP, and is liable for the debts and obligations of the limited partnership of Texas Lehigh Cement Company, LP, under the authority of TEX. BUS. ORG. CODE § 153.152(b) because it is the general partner of a limited partnership and it has the liabilities of a partner in a partnership without limited partners to a person other than the partnership and the other partners.

8. Defendant Eagle Materials, Inc., is the general partner of Texas Lehigh Cement Company, LP, and is liable for the debts and obligations of the limited partnership of Texas Lehigh Cement Company, LP, under the authority of TEX. BUS. ORG. CODE § 153.152(b) because it is the general partner of a limited partnership and it has the liabilities of a partner in a partnership without limited partners to a person other than the partnership and the other partners.

9. A creditor, such as Plaintiff, may seek to obtain a judgment against a partner or partners, individually, in the suit simultaneously against the partnership or in a separate suit. TEX. BUS. ORG. CODE § 152.305.

10. All claims in this lawsuit against Lehigh Hanson, Inc., and Eagle Materials, Inc., are brought under this authority and references throughout this complaint to Lehigh Hanson, Inc.,

2

and Eagle Materials, Inc., are because they are liable for the debts and obligations of Texas Lehigh Cement Company, LP, arising from this lawsuit under these authorities for which Plaintiff seeks judgment.

## II.   JURISDICTION

11.   This Court has subject matter jurisdiction because Plaintiff's damages are in excess of the minimal jurisdictional limits of the Court and within the maximum jurisdictional limits of the Court.

## III.   VENUE

12.   Venue is proper in the Hays County District Court because Hays County is the county in which all or a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred.

## IV.   FACTUAL ALLEGATIONS

13.   Zavala began working for Texas Lehigh at its plant in Buda as a Utility Man in June 2012.

14.   Zavala worked hard and diligently while employed at Texas Lehigh, which was evidenced by his rise through the company ranks.

15.   In 2013, Zavala was promoted to Utility Leadman, or Lead.

16.   While he was a Lead, one of Zavala's duties was to crawl into a confined space (a pre-heater) as requested by his supervisor, the Utility Supervisor.

17.   This task only came up approximately four days in a row per year, during an annual "outage."

18.   Crawling into confined spaces in a cement plant is an inherently dangerous activity.

19. That is why the Federal Occupational Safety and Health Agency defines and controls confined space entries on industrial locations like a cement plant.

20. Crawling into confined spaces is especially dangerous for people with mobility impairments, because the difference between life and death can be measured in the number of seconds it takes to crawl out of the confined space if something goes wrong.

21. In 2016, Zavala was promoted to Utility Supervisor.

22. In this role, Zavala no longer needed to crawl into confined spaces. The Leads would do it, and as supervisor, Zavala would supervise them.

23. Zavala loved this job and the work he did, and he thought he had found a place where he could spend his career and eventually retire.

24. Zavala arranged his life around this job, buying a nearby house for his family, his parents, and his mother-in-law.

25. On December 4, 2017, Zavala was unfortunately seriously injured in a motorcycle accident while returning home from work.

26. As a result of Zavala's accident, his leg was amputated above the knee.

27. Zavala went on short-term disability for his immediate recovery period.

28. Zavala understood that short-term disability for supervisors was handled entirely in-house and was not reported to the company's insurance provider, Unum.

29. Zavala was out of work for approximately five months while he rehabbed and adjusted to using a prosthetic leg.

30. On May 2, 2018, Zavala went in for a meeting with Texas Lehigh.

31. Zavala informed Texas Lehigh that his femur was still broken and would require an additional surgery.

4

32. Texas Lehigh told Zavala that he needed to return to work before six months had elapsed, or else his short-term disability would run out and he would be terminated.

33. To avoid termination, and at Texas Lehigh's direction, Zavala obtained a work release from his doctor permitting him to return to work on May 8, 2018 with restrictions that he wears a knee brace and take breaks.

34. On May 8, 2018, at Zavala's return to work meeting with the plant manager and safety director, Texas Lehigh told Zavala that they expected him to do everything he used to do before the injury and more, and presented him with a newly-made job duties list.

35. Zavala noted several things he had been doing regularly pre-injury, such as building scaffolds, that he no longer felt safe doing with one leg and a prosthetic leg.

36. The plant manager agreed that Zavala, as a supervisor, should and did have people to do those tasks instead, which were not core supervisor duties; these were things Zavala went above and beyond to do, or, like building scaffolds, that he had done because he enjoyed the work and was good at it.

37. Zavala reminded Texas Lehigh that he still had a broken femur that required surgery and asked how long he needed to be back at work before he was permitted to go back out on short-term disability

38. The plant manager did not know when Zavala would be able to go back out on short-term disability.

39. Texas Lehigh did not have a Human Resources department on-site.

40. Zavala emailed Jason Gilbert, the employee in accounting who had been handling the short-term disability policy, who told him that there was no set time he was required to be back at work before going back out on disability.

5

41. On June 12, 2018, Zavala had the planned femur surgery.

42. After the surgery, Zavala remained out of work for six months.

43. Zavala returned to work on or around December 11, 2018, after having a physical with Concentra on December 10, 2018, and was once again able to successfully perform all his core supervisor duties.

44. However, Zavala found several aspects of working at Texas Lehigh after losing his leg challenging.

45. For example, Texas Lehigh was not handicap accessible.

46. Texas Lehigh did not even have handrails in the bathroom. When Zavala inquired about bathroom handrails, Zavala was told he could buy them and install them himself if he really needed them.

47. In spite of these issues, Zavala worked without incident until May 18, 2019, when he needed a surprise gallbladder surgery unrelated to his leg injury.

48. After a brief absence from work to recover from the gallbladder surgery, Zavala went to Concentra for his return-to-work physical on May 28, 2019.

49. Concentra sent Zavala home without clearing him to work, representing that he would be required to be able to lift 100 pounds in order to be cleared to return to work, which Zavala's physician had not cleared him to do.

50. Zavala communicated back and forth with his contacts at Texas Lehigh, who eventually asked if lowering the lifting criteria to 15 pounds would be consistent with his physician's restrictions.

51. Zavala responded that yes, a 15-pound lift restriction was consistent with his surgeon's restrictions, as well his previous Concentra releases, and would not affect his core job duties.

6

52. On June 7, 2019, Zavala returned to work from the gallbladder surgery, with the 15-pound lifting restriction in place.

53. On June 27, 2019, Zavala left work for a long-planned ACL surgery, necessitated by his original motorcycle accident.

54. The surgeon wanted to wait several months after Zavala's previous femur surgery before scheduling the ACL surgery.

55. Zavala was again out of work for roughly six months.

56. On December 10, 2019, Zavala's doctor gave him a clearance to immediately return to work with restrictions, including to use a cane as needed.

57. Zavala scheduled another Concentra evaluation for December.

58. On December 13, Texas Lehigh told Zavala that in order to return to work, he needed a full release from his doctor, without any restrictions.

59. Texas Lehigh represented it had a 100% healed policy, meaning it required workers to be fully unrestricted before returning them to work.

60. At this time, a disagreement about Zavala's job duties arose.

61. Texas Lehigh now claimed that Zavala, now a Supervisor, needed to personally crawl into a confined space (a pre-heater).

62. Zavala contended that he did not feel safe doing this with his prosthetic leg.

63. This task was unsafe for Zavala to perform because of the mobility issues caused by losing both his leg and knee—the number of seconds it takes Zavala to crawl out of the pre-heater if something goes wrong were higher than before his accident, and more than someone who had not lost both their leg and knee.

64. Zavala pointed out to Texas Lehigh that he can appoint a lead to do this duty and had done so in the past, including all of his time at work since his accident and leg amputation.

65. In April 2019, for example, Zavala had his Day Leadman go into these spaces, with no issue.

66. Zavala pointed out that back when he was a lead, Zavala had performed this duty for the previous Utility Supervisor.

67. Texas Lehigh refused to budge from their contention that Zavala himself, a supervisor, must personally crawl into the pre-heaters.

68. On December 20, 2019, Zavala attended another meeting with Texas Lehigh to attempt to resolve the issue.

69. During the meeting, they were unable to come to an agreement about Zavala's return to work because of the purported requirement that Zavala himself crawl into the pre-heaters, instead of delegating the task.

70. Zavala again contended that he did not feel safe crawling in and out of this confined space with a prosthetic leg, and again pointed out that there was no reason why he personally needed to do so, as both he and previous Utility Supervisors had delegated this task in the past without issue.

71. Texas Lehigh insisted that Zavala as Utility Supervisor was required to crawl in and out of this confined space from now on and that they would not accommodate him on this issue any more.

72. Texas Lehigh sent Zavala home without resolution.

73. On December 23, 2019, Zavala attended a final meeting with his managers and president.

74.    Zavala was informed that he was being terminated because of his "refusal to accept [his] job duties," meaning this specific duty of climbing into a specific confined space that was unsafe for him to perform and that could easily be delegated and had previously been delegated to other employees.

75.    Zavala confirmed with Texas Lehigh that the company's refusal to accommodate his injury and injury-based limitations were the reason for his termination.

76.    Texas Lehigh acknowledged that the Company's refusal to accommodate Zavala's injury and injury-based limitations were the reason for Zavala's termination.

### V.    CAUSE OF ACTION: DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE ADAAA AND TCHRA

77.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

78.    Defendant violated the ADAAA and TCHRA by refusing to accommodate Plaintiff's disability, by failing to engage in an interactive process with Plaintiff, and by discharging Plaintiff. 42 U.S.C. § 12101 *et seq.*; TEX. LABOR CODE § 21.001 *et seq.*

79.    Under 42 U.S.C. §12112 and Texas Labor Code § 21.001 *et seq.*, it is unlawful for an employer to discriminate against any individual with respect to his employment because of that individual's actual disability, record of disability, or because the employer regards the individual as a person with a disability.

80.    Defendant is an employer under the ADA and TCHRA.  Defendant is engaged in an industry affecting commerce and had more than 15 employees in each of 20 or more calendar weeks during the year in which Plaintiff was terminated, or in the preceding calendar year.

81. At all times relevant to this suit, Plaintiff was a qualified individual with a disability, was a qualified individual with a record of a disability, and was regarded by the Defendant as a person with a disability.

82. Plaintiff was qualified for and could perform the essential functions of his job at the time of his termination, with reasonable accommodations.

83. Plaintiff was meeting his employer's expectations.

84. Plaintiff was terminated as a direct result of his disability, his record of having a disability, and/or because Defendant regarded Plaintiff as a person with a disability.

85. Defendant violated both the ADA and TCHRA by intentionally refusing to accommodate Plaintiff's disability, retaliating against him for seeking accommodations and for taking leave, and by discriminating against Plaintiff because of his disability by terminating Plaintiff's employment.

86. Plaintiff's disability, record of having a disability, and/or Defendant's regarding Plaintiff as a person with a disability was a determining or motivating factor in Defendant's decision to terminate Plaintiff's employment.

87. Plaintiff's disability, record of having a disability, and/or Defendant's regarding Plaintiff as a person with a disability moved Defendant toward its decision or was a factor that played a part in Defendant's employment decisions as to Plaintiff.

## VI.   DAMAGES

88. As a result of Defendants' unlawful conduct, Plaintiff has suffered economic and actual damages, including past and future lost income, back wages, interest on back pay and front pay, future wages or front pay, lost earnings in the past and future, lost benefits under the contract or employment relationship, employment benefits in the past, and employment benefits and lost

tenure and other benefits in the future. Plaintiff has also incurred other actual damages as a result of Defendants' unlawful conduct, including but not limited to past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of earning capacity, loss of enjoyment of life, injury to professional standing, injury to character and reputation, and other pecuniary and non-pecuniary losses.

## VII.   COMPENSATORY DAMAGES

89.   Defendants intentionally engaged in an unlawful employment practice by refusing to accommodate Plaintiff's disability, and by discriminating against Plaintiff because of his disability, his record of having a disability, and/or because Defendants regarded Plaintiff as being disabled. Plaintiff additionally brings suit for compensatory damages, including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, job search expenses, lost earning capacity in the past and future, and other pecuniary and non-pecuniary losses.

## VIII.   PUNITIVE DAMAGES

90.   The conduct committed by Defendants against Plaintiff is the type of conduct demonstrating malice or reckless indifference to the rights of the Plaintiff. Therefore, Plaintiff additionally brings suit for punitive damages.

## IX.   ATTORNEYS' FEES

91.   Prevailing party may recover reasonable attorneys' and experts' fees. TEX. LAB. CODE §21.259. Plaintiff seeks all reasonable and necessary attorneys' fees in this case, including

11

preparation and trial of this lawsuit, post-trial, pre-appeal legal services, and any appeals. Plaintiff additionally brings suit for expert fees.

## X. DEMAND FOR A TRIAL BY JURY

92. Plaintiff demands a trial by jury of all the issues in this case and tenders herewith the requisite jury fee.

## XI. REQUEST FOR DISCLOSURES

93. Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XII. PRAYER FOR RELIEF

94. WHEREFORE, cause having been shown, Plaintiff prays for, on trial of this just cause, judgment against Defendants as follows:

    a. All actual damages, including but not limited to past and future lost wages, past and future lost benefits, lost benefits of contract;

    b. Compensatory damages;

    c. Punitive damages;

    d. Pre-judgment and post-judgment interest as allowed by law;

    e. Court costs and expenses, and litigation expenses, including but not limited to the expenses for any expert witnesses;

    f. Equitable relief, including reinstatement, front pay;

    g. Attorneys' fees; and

h. Any such further relief as the Court deems proper and just under the circumstances.

                    Respectfully Submitted,
**KAPLAN LAW FIRM, PLLC**
406 Sterzing Street
Austin, Texas 78704
Telephone: (512) 553-9390
Telecopier: (512) 692-2788
www.kaplanlawatx.com

By: */s/ Matthew "Maff" Caponi*
**Austin Kaplan**
State Bar No. 24072176
akaplan@kaplanlawatx.com
**Matthew Caponi**
State Bar No. 24109054
mcaponi@kaplanlawatx.com

13